**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **KWAME ROCKWELL,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **Civil Action No. 4:14-CV-1055-O** |
| | § | **(death-penalty case)** |
| **LORIE DAVIS, Director, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |
| | § | |
| | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Kwame Rockwell ("Rockwell") petitions the Court for a writ of habeas corpus, raising eight claims and contending that his conviction and death sentence are unconstitutional.  Having reviewed the record, the briefs, and the exhibits tendered by the parties, the Court concludes that Rockwell is not entitled to relief under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), **DENIES** the petition, and **DISMISSES this action with prejudice**.

**I.      BACKGROUND**

In January 2012, Rockwell (at times "the appellant" or "the defendant") was convicted and sentenced to death for the murder of Daniel Rojas in the course of committing robbery.  *See* Tex. Penal Code § 19.03(a)(2).[1]  The Texas Court of Criminal Appeals ("CCA") affirmed the conviction in an unpublished opinion on direct appeal.  *Rockwell v. State*, No. AP-76737, 2013 WL 6529575

---

[1] All cites to Texas statutes are to those then in effect, unless otherwise noted.

1

(Tex. Crim. App. Dec. 11, 2013), *cert. denied*, 134 S. Ct. 2724 (2014). The Court takes the following recitation of facts from that opinion:

> The appellant was the co-owner of a used car business located next to a Valero gas station and convenience store in Fort Worth. The car business was struggling and in danger of losing the lease on the property, but the appellant and several other employees noticed the Valero next door was always busy and did a big check-cashing business. The men decided to commit robbery at the convenience store because they thought a large amount of cash was stored there.
>
> Appellant's co-conspirator, Chance Smith, testified that the appellant set up a meeting with Smith and told him to bring another man because the appellant wanted them to help him commit the robbery. The appellant told the participants who would be involved and what their roles would be. He brought walkie-talkies to the car lot before the offense and said they were to be used during the robbery. The appellant and his co-conspirators engaged in several botched attempts at the robbery in the days leading up to the offense. The appellant told Smith that he (the appellant) would carry a gun so he could shoot anyone who recognized them, and another man would carry a gas can to burn the store, eliminating any evidence. There was testimony that the appellant was known to carry a gun frequently.
>
> On March 23, 2010, Valero employee Daniel Rojas arrived at the convenience store early in the morning to open for the day and let a Mrs. Baird's delivery driver, Jerry Burnett, into the store to restock the shelves. Surveillance video showed that around 6:20 a.m., three men wearing dark clothing and black ski masks entered the store. The first man carried a gun, the second man carried a bag, and the third man carried a red gas can and stayed near the front door.
>
> The first man shot Burnett in the head where he stood in an aisle of the store, and then the first and second men forced Rojas to open the cash register and give them a large bundle of cash that was in a freezer in the store's office area. The first man then shot and killed Rojas in the office area. A customer pulled up outside, and the three masked men quickly left. As they ran out, the first man pointed his gun at the customer outside but did not shoot.
>
> The man with the gun and the man with the bag were about the same height, but the man with the gun had dark skin and the second man had light skin. The shooter used his left hand to shoot both Burnett and Rojas. The appellant was a left-handed, dark-skinned African American; Randy Seibel was a right-handed, light-skinned Caucasian; and Tyrone Thomas was a right-handed African American who was noticeably shorter than the other two men.

When police arrived, Burnett was still alive.  He was taken to the hospital where he died ten days later.

Three cars belonging to the appellant, Smith, and Tim Thomas (another accomplice) were seen on surveillance video arriving at Smith's apartment between 7:05 a.m. and 7:50 a.m. on the morning of the offense.  The appellant did not return to work at the car lot after the offense.

Four days later, the appellant was approached by uniformed officers in San Antonio while he was sitting in his truck.  He jumped out of the vehicle and ran away.  He barricaded himself in a convenience store restroom, yelling that he would kill himself. When police broke the door open, the appellant was holding a piece of broken glass to his throat.  As they handcuffed him, the appellant told police, "Just f ----- kill me, man. I'm going to die in there anyway."

The evidence at trial showed that the day before the offense, the appellant, who owed his ex-wife a large amount of money, told her that he would pay her some of it the next day.  Someone from the car lot also arranged to have the car Smith said was used in the offense towed from where it was parked at the appellant's cousin's vacant house later on the day of the offense.  Smith testified that the appellant met him after the offense and gave him money to pay the tow-truck driver.

In the river behind the appellant's apartment complex was found a black, hooded sweatshirt, similar to those seen on the surveillance video from the convenience store. On it was a partial DNA profile from which the appellant could not be excluded.

*Id.* at *2–3.

While the appeal was pending, the Office of Capital Writs ("OCW")[2] filed Rockwell's application for state habeas relief on September 17, 2013.  The convicting court signed its findings and recommendation on September 8, 2014.  4 SHCR 1678–1754.[3]  The CCA adopted the

---

[2] Now known as the Office of Capital and Forensic Writs, the OCW is appointed, with few exceptions, to represent death row inmates in Texas for the purpose of pursuing a writ of habeas corpus in state court.  *See* Tex. Gov't Code § 78.054 (West 2015); Tex. Code Crim. Proc. art. 11.071, § 2.

[3] The state habeas clerk's record is cited SHCR, preceded by volume number and followed by page number.  The state habeas reporter's records are cited 1 SHRR (April 16, 2014) and 2 SHRR (May 29, 2014). Similarly, the trial court clerk's record is CR, and the trial court reporter's record is RR.

3

convicting court's findings and conclusions and denied Rockwell's application on December 17, 2014. *Ex parte Rockwell*, No. WR-80,232-01 (Tex. Crim. App. Dec. 17, 2014) (per curiam) (unpublished).

The Court appointed federal counsel, and Rockwell filed his federal petition on December 10, 2015, raising eight claims for relief. *See* Pet., ECF No. 9. Respondent filed her Answer with Brief in Support on May 11, 2016. *See* Ans., ECF No. 14. The parties do not dispute that all of Rockwell's claims were previously adjudicated on the merits in state court.

## II.    STANDARD OF REVIEW

When a federal habeas petitioner challenges a prior state court adjudication on the merits, the AEDPA bars relitigation of the claim in federal court unless it: (1) is "contrary to" federal law then clearly established in the holdings of the Supreme Court or "involved an unreasonable application of" such law; or (2) "was based on an unreasonable determination of the facts" in light of the record before the state court. *See* 28 U.S.C. § 2254 (1996)[4]; *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011). This determination is limited to the record that was before the state court that adjudicated the claim on the merits. § 2254(d)(2); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). These conditions are meant to be difficult to meet and stop short of imposing a complete bar on the relitigation of claims already rejected in state proceedings. *Richter*, 562 U.S. at 102.

A state court's decision is "contrary to" Supreme Court precedent if the state court applies a rule that contradicts governing law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a different result. *Coleman v. Thaler*, 716 F.3d 895, 901 (5th Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)). A state court's

---

[4] All citations to § 2254 are to 28 U.S.C. § 2254 (1996).

4

application of law is "unreasonable" when the state court identifies the correct governing legal principle but applies it unreasonably to the facts of a particular case. *Id*. at 901–02. The petitioner must show that the state court ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103; *see also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102; *Woodall*, 134. S. Ct. at 1702 (stating a "merely wrong" holding or "clear error" will not suffice).

Factual determinations in a state court's decision are presumed correct, and a petitioner bears the burden of rebutting them by clear and convincing evidence. *See* § 2254(e)(1); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). A "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); § 2254(d)(2). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt*, 134 S. Ct. at 15 (citing *Wood v. Allen*, 558 U.S. 290, 301 (2010)). The presumption of correctness attaches to explicit findings of fact as well as "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Pippin v. Dretke*, 434 F.3d 782, 788 (5th Cir. 2005) (quoting *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)).

## III.    CLAIMS

Rockwell raises eight claims in his petition: (1) trial counsel was ineffective for failing to investigate and present evidence of mental illness in mitigation; (2) trial counsel was ineffective for

failing to investigate and present evidence of his illegal steroid use in mitigation; (3) trial counsel was ineffective for failing to rebut the State's theory that he was the "mastermind" behind the capital murder; (4) trial counsel was ineffective for failing to rebut the testimony of Teresa Jackson, his ex-wife; (5a) appellate counsel was ineffective for failing to appeal the denial of challenges for cause lodged against eight prospective jurors; (5b) the state court violated *Wainwright v. Witt* when it denied his appeal of three additional challenges for cause;  (6) his execution is barred under *Atkins v. Virginia* because he is mentally ill; (7) the Texas mitigation special issue violates the Eighth and Fourteenth Amendments; and (8) the discretion afforded Texas prosecutors in deciding to seek the death penalty violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## A.      Sufficiency of the State Court Process

In Claims 1 through 5, Rockwell argues that the state habeas court misapplied § 8 of Texas Code of Criminal Procedure article 11.071 and adjudicated his Sixth Amendment claims in a manner that "did not satisfy the minimum procedural requirements of the Fourteenth Amendment's due process clause." Pet. at 30–31, 45, 52, 59, 62–63.  Rockwell raises three specific objections, arguing that the court: (1) "ordered witnesses to file statements before determining and notifying the parties whether controverted, material fact issues existed"; (2) "failed to designate which (if any) controverted, material fact issues existed and to provide notice thereof to the parties as required by the statute"; and (3) "failed to designate the manner by which the court would hear evidence to resolve any designated controverted, material fact issues and to provide notice thereof to the parties as required by statute."  Pet. at 31.  Respondent answers that "[s]ince a state post-conviction proceeding is not required . . . , it follows that Rockwell has no constitutional right to a designation

6

of issues or to a certain manner in which the state habeas court would hear evidence." Ans. at 39. Respondent also asserts that the state court process met state law and federal constitutional requirements. Ans. at 39–49.

Rockwell filed his state habeas application with 34 supporting exhibits consisting of four expert affidavits, 18 lay witness affidavits, seven excerpts of records and other documents, and five excerpts from family medical documents. 1 SHCR 191–92. The State moved the convicting court to order trial counsel, Mark Daniel and Tim Moore, and appellate counsel, David Richards, to file affidavits addressing the ineffective-assistance claims in Rockwell's application. 2 SHCR 865. Rockwell filed a response to the motion, not opposing the request for affidavits, but asking that "the parties be allowed a period of time to determine which facts are in dispute," after which "the Court should order further fact-finding through either depositions or a live hearing." 2 SHCR 870–73. Upon the court's order, Richards filed an affidavit, and Daniel and Moore filed substantially identical affidavits with ten supporting exhibits. 2 SHCR 897 (Order), 912 (Richards), 920 (Moore); 3 SHCR 1024 (Daniel). These affidavits were filed publicly in the ordinary course of court business. The State then filed its answer to the application with two supporting exhibits, all of which were served on Rockwell. 3 SHCR 1128–1296, 1306 (K. Rousseau Aff.), 1314–16 ( T. Moore Aff.). The day after the State filed its answer, Rockwell moved to recuse the habeas judge on the ground that Daniel had represented her in an unrelated matter. 3 SHCR 1297. As a result, the case was reassigned to another district court judge, Scott Wisch. 3 SHCR 1310.

Judge Wisch set the case for a status-conference hearing "regarding the designation of factual and legal issues requiring resolution and whether further presentation of evidence is necessary." 3 SHCR 1311. At the status hearing, Judge Wisch informed the parties that he had read most of the

7

file, was familiar with the issues, and wanted to lay the ground rules for how they would proceed. 1 SHRR 6–7. There was lengthy discussion about whether Rockwell had shown the need for a live hearing based on the nature of each claim and the State's stipulation to certain facts. The parties also discussed whether Rockwell could show the need for a live hearing with more factual development. Judge Wisch allowed Rockwell to address each claim individually. 1 SHRR 49, 54–56, 59–61, 67–71, 88–90, 92. The judge said he would go through the affidavits in detail looking for material factual disputes, and he gave Rockwell 23 days of "cleanup time" to liberally "supplement stuff, correct stuff, [and] upgrade stuff." 1 SHRR 64–65, 89, 95, 100. Judge Wisch told the parties, "I'm going to do a lot more reading because I don't rely on nor am I allowed to rely on what either of you write unless it's clear you are in agreement as to what facts govern or control or provide support to positions . . . And so I'll be reading the affidavits myself. I'll be going back to the trial record. . . ." 1 SHRR 43–44. After the status hearing, Rockwell supplemented his application with additional briefing and ten additional exhibits from trial counsel's file. 3 SHCR 1357–1455. The State also filed supplemental briefing and provided an additional affidavit from Mark Daniel with multiple exhibits. 3 SHCR 1457, 1469. On May 29, 2014, Judge Wisch stated on the record that he was of the opinion that the "voluminous and detailed pleadings of the parties and affidavits attached thereto were sufficient for the Court to make a decision on the specific and limited legal issues" and then heard oral argument from both parties. 2 SHRR 4. The parties filed proposed findings and conclusions in July of 2014, and Judge Wisch issued his recommendation on September 9, 2014. 4 SHCR 1495, 1601, 1678.

Rockwell now contends that this procedure did not comply with the Texas writ statute and, consequently, did not provide the notice and hearing required under the Due Process Clause. First,

the AEDPA provides relief for violations of the Constitution or laws or treaties of the United States. § 2254(a). Federal habeas corpus relief does not lie for errors in state law, such as the alleged failure to follow Texas Code of Criminal Procedure article 11.071. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)); *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998) (holding that alleged violations of state law in the state habeas proceedings do not furnish a basis for federal habeas corpus relief). Consequently, any deviation from the procedure in article 11.071, assuming it exists, does not alone provide relief in this Court.

Furthermore, a complaint about an alleged constitutional violation during the course of the state habeas proceeding is "an attack on a proceeding collateral to the detention and not the detention itself." *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004). Thus, "[i]t is well-settled that 'infirmities in state habeas proceedings do not constitute grounds for federal habeas relief.'" *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003) (quoting *Duff-Smith v. Collins*, 973 F2d 1175, 1182 (5th Cir. 1992)). Even if such complaints were cognizable, the Court is not persuaded that the procedure employed by the state habeas court deprived Rockwell of notice and an adequate opportunity to be heard. Specifically, Rockwell does not show how he was harmed or placed at a disadvantage by the timing of the filing of affidavits from his previous attorneys (nor does 11.071 prohibit the filing of affidavits in response to the application). Indeed, Rockwell did not oppose the State's request for affidavits at the time it was made. 2 SHCR 870. Second, he does not demonstrate how the habeas court's failure to designate "controverted, material fact issues" prevented him from marshaling evidence or argument to prove his claims, except that it relegated him to a "paper hearing," the use of which has been consistently upheld in this Circuit. *See Valdez v. Cockrell*, 274 F.3d 941, 949–50 (5th Cir. 2001) (clarifying that deference to state habeas court's factual

determinations is not dependent upon the quality of the state court's evidentiary hearing); *see also Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000) (holding, under pre-AEDPA statute, that a paper hearing is sufficient); *Livingston v. Johnson*, 107 F.3d 297, 303 (5th Cir. 1997) (noting that the Fifth Circuit has consistently upheld the validity of paper hearings under pre-AEDPA statute); Tex. Code Crim. Proc. art. 11.071, § 8 (providing for findings of fact without evidentiary hearing when there are no "previously unresolved factual issues material to the legality of applicant's confinement").  Finally, Rockwell's complaint that the state court failed to designate and provide notice of the "manner" by which it would hear evidence and resolve any designated fact issues does not appear to be supported by the record.  Judge Wisch made it clear at the status hearing that he had looked for controverted, material fact issues and would continue to do so after the parties filed their supplemental materials.  Judge Wisch also made it clear that he did not believe a live hearing was necessary at that time, and Rockwell acknowledged as much in a subsequent motion seeking a protective order for his supplemental exhibits.  3 SHCR 1333.

At the heart of this complaint is Rockwell's assertion that, absent a live hearing, the state court was required to accept the factual assertions in his application as true, even though they were disputed by witness affidavits, expert reports, or other documentary evidence.  Pet. at 7.  Rockwell presents no support for this assertion other than his own interpretation of how the writ procedure in article 11.071 should operate.  Pet. at 29–31.  His contention that a Texas writ proceeding without a live hearing is effectively a summary judgment determination on the pleadings is at odds with the plain text of the statute, which contemplates the "resolution" of material facts even before the hearing determination is made.  *See* art. 11.071, § 8(a) (entitled "Findings of Fact without Evidentiary Hearing" and requiring court to determine if "previously unresolved" material fact issues

exist).[5]  Moreover, Rockwell's related complaint that none of the multitude of exhibits and affidavits

in this case are evidence because they were not formally admitted at the habeas proceeding is

unsupported in Texas law.  *Ex parte Campbell*, 226 S.W.3d 418, 423 (Tex. Crim. App. 2007) (noting

that exhibits attached to the State's motion to dismiss are as much a part of this habeas record as are

applicant's attachments); *Ex parte Fassi*, 388 S.W.3d 881, 887 (Tex. App.—Houston [14th Dist.]

2012, no pet.) (finding that documents attached as exhibits to the defendant's 11.072 habeas

application and the State's response could be considered by the habeas court even though they were

not introduced into evidence by any party); *see Ex parte Reagan*, 549 S.W.2d 204, 205 (Tex. Crim.

App.1977) (relying on *Killion v. State* to affirm where court and parties treated governor's warrant

in habeas corpus hearing as if admitted into evidence); *Killion v. State*, 503 S.W.2d 765, 765–66

(Tex. Crim. App. 1973) (reviewing court permitted to consider defendant's stipulations to charged

offenses where considered by trial court in adjudicating guilt for theft and burglary, although written

stipulations were not admitted into evidence).  Accordingly, Rockwell fails to demonstrate that the

state court's procedure precludes the application of AEDPA deference or undermines the

reasonableness of the state court ruling.  The Court **DENIES** this subclaim as presented in Claims

1 through 5.

### B.        Claims 1–5 (Ineffective Assistance of Counsel)

Claims 1 through 5 allege counsel provided ineffective assistance at Rockwell's trial and on

appeal.  *See* Pet. at 17–66.  Rockwell asserts that his trial and appellate counsel were ineffective in

their: (1) investigation and presentation of his mental illness history in mitigation; (2) investigation

---

[5] Rockwell's argument that he was entitled to judgment on his pleading also fails to address the fact that there were significant, false assertions of fact in his application for which state habeas counsel unequivocally apologized at the status hearing.  1 SHRR 26–27, 31–32, 41, 76.

and presentation of his steroid use; (3) failure to rebut the State's "mastermind" evidence; (4) failure to rebut the testimony of Teresa Jackson; and (5) failure to appeal the trial court's denial of trial counsel's motions to strike eight veniremembers for cause during voir dire.

### 1.   Applicable Law

The clearly established federal law governing claims of ineffective assistance of trial counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams*, 529 U.S. at 398–99. Under *Strickland*, Rockwell must first demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The objective standard of reasonable representation is defined by prevailing professional norms and is necessarily a general standard. *See Bobby v. Van Hook*, 558 U.S. 4, 7 (2009).

The Constitution imposes "one general requirement: that counsel make objectively reasonable choices." *Id*. at 9. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at 690). This standard not only gives trial counsel the benefit of the doubt, but affirmatively entertains the range of possible reasons counsel may have had for proceeding as they did. *Id.* at 196. Regarding counsel's duty to investigate, strategic decisions made by counsel following a thorough investigation are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Trial counsel's failure to reasonably investigate and present mitigating evidence to a sentencing jury, when such evidence would have been discovered by a reasonably competent defense attorney, amounts to ineffective assistance of counsel. *Wiggins*, 539 U.S. at 534. As a general rule, however, counsel's selection of a strategy is unchallengeable. *Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007). "[S]trategic choices made after [a] less than complete investigation are

12

reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691.

Next, Rockwell must demonstrate that there is a reasonable probability that prejudice, sufficient to undermine confidence in the trial outcome, resulted from counsel's deficiency. *Id.* at 694. A "reasonable probability" of prejudice requires a substantial, not just a conceivable, likelihood of a different outcome. *Pinholster*, 563 U.S. at 189. For claims that challenge counsel's sentencing investigation, the reviewing court reconsiders the evidence in aggravation against the totality of available mitigating evidence and determines whether there is a probability, sufficient to undermine confidence in the outcome, that the jury would have assessed a life sentence. *See Wiggins*, 539 U.S. at 534.

In habeas proceedings, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," not whether defense counsel's performance fell below *Strickland*'s standard. *Richter*, 562 U.S. at 101. This review is "doubly deferential" and gives both the state court and the defense attorney the benefit of the doubt. *Titlow*, 134 S. Ct. at 13. Here, Rockwell must demonstrate that it was necessarily unreasonable for the CCA to conclude: (1) that he did not overcome the strong presumption of trial counsel's competence; and (2) that he failed to undermine confidence in the jury's sentence of death. *See Pinholster*, 563 U.S. at 189. With this framework in mind, the Court turns to Rockwell's ineffective assistance claims.

2. <u>Factual Background</u>

a. *Aggravating Evidence at Trial*

*The Crime.* The State called over 100 witnesses during trial on the merits and offered nine witnesses during the punishment phase. RR vols. 41–49; 51 RR 12, 62, 72, 82, 111, 147, 178; 52

RR 15, 82.  These witnesses described the planning and execution of the swift, brutal robbery and murder of two victims and the resulting investigation.  The trial evidence included video security footage, DNA evidence, photos of the victims and testimony from their family members, as well as testimony from accomplices, witnesses at the scene of the crime, police officers, and expert analysts. *See*, *e.g.*, 41RR 66, 70, 73–75, 101, 179–83; 46 RR 40; 47 RR 10–25, 163–64.

Rockwell's accomplice, Chance Smith, testified both at trial on the merits and in the punishment phase.  42 RR 148; 51 RR 12:15–17.  Rockwell's car lot hired Smith, and the two worked together for a little over a year and a half before they were arrested in March 2010.  42 RR 159.  When Smith first joined the car lot, the business was doing well.  Rockwell typically attended auctions to buy cars to sell on the lot, and Smith wrote the contracts.  42 RR 157:5–7.  When business slowed down, and the men risked losing the lease on their car lot, Smith and Rockwell observed that the Valero gas station next to the car lot had a robust check-cashing business, which they believed required a large store of cash on hand.  45 RR 163–64, 167, 169.  The defendants regularly patronized the Valero, cashed their own IRS checks there, and were on a first-name basis with one of the Valero clerks, a 22-year-old named Daniel Rojas.  42 RR 162:23–163:10.  After surveilling the gas station, Rockwell created a plan to rob the store's owner, Mr. Vo, for the business's cash.  *See* 42 RR 169.  Initially, the defendants planned to stage an automobile accident with Mr. Vo as he drove to the bank and then rob him at gunpoint of his check-cashing money.  51 RR 14–19:25.  This plan was unsuccessful when Mr. Vo did not drive to the bank, and they eventually lost sight of him.  51 RR 14–19.  In the days before the offense, when the defendants thought they saw Mr. Vo move the money to his home, they schemed to attack the Vos' home with homemade napalm to force the Vos to move the money out of the house, where they could steal it.

14

51 RR 21–25.  Mrs. Vo described being awoken at 5 a.m. by a neighbor banging on her door and

voices shouting "fire," and her son and husband attempting to put the fire out with dirt and water.

51 RR 72–76.  Rockwell ran from the scene before the fire trucks arrived.  51 RR 26–27.

On the day of the offense, Smith waited in the car while Rockwell and two others entered the

Valero.  44 RR 168.  One of the accomplices carried a tank of gasoline, as Rockwell planned, to light

the Valero on fire and destroy security cameras in the store after the robbery.  44 RR 157.   Rockwell

led two accomplices into the Valero gas station and shot an elderly stockman, Jerry Burnett, in the

face.  *See*, *e.g.*, 42 RR 116; 44 RR 196.  Daniel Rojas fled into a storage room, but the men escorted

him back into the store, where he retrieved cash from the cash register and one of the store's freezers.

43 RR 93–95.  Rockwell shot Rojas in the right temple while his fingers were laced with his hands

behind his head.  43 RR 101; 47 RR 15.  An accomplice explained that Rockwell shot Rojas because

Rojas knew them.  44 RR 196.  Rojas died at the scene, but the stockman arrived at the hospital, still

alive, covered in the gasoline with which Rockwell and his accomplices planned to burn down the

gas station.  42 RR 75; 43 RR 12.  Burnett died ten days later.  41 RR 64:23–65:2; 48 RR

57:24–58:2. As they exited the store, Rockwell also pointed his gun at a customer in the parking lot.

44 RR 170.  The jury watched the crime from multiple angles on Valero's video security footage.

42 RR 82–87, 98.

*Other Conduct.*  Before committing the Valero robbery, Smith and Rockwell also planned

to rob a bank, a Conoco gas station, and a Tiger Mart.  51 RR 33–35.  After the Valero robbery,

Rockwell told his accomplices, "We can't stop, we have to keep going," which Smith interpreted

as meaning that Rockwell wanted to commit the other robberies.  51 RR 36.  In fact, the two men

met at the Tiger Mart and discussed a plan to rob it before they were arrested.  51 RR 36–37.  Smith

told the jury that, after his arrest, he feared the Rockwell would harm him or his loved ones.  51 RR 40–42.

The jury also learned that, around September of 2009, Rockwell began to travel to Mexico with his girlfriend, where he would fraudulently take financed cars and sell them.  42 RR 160:9–11. While there, Rockwell attempted to purchase promethazine to make "purple syrup"—an intoxicating beverage made from prescription drugs—for him and his friends to sell.  51 RR 30–33, 48; 56 RR 14.

The record shows Rockwell had a modest history of domestic violence before committing robbery and murder.  In one instance, Rockwell went to his ex-wife's home, and while she was in the shower hid all of her phones.  51 RR 81–89.  He then locked the door and pointed a gun at her until she would return a stack of business cards containing other women's phone numbers.  51 RR 88–90.  On another occasion, Rockwell pleaded guilty to misdemeanor assault after he threw DVDs at his ex-wife, injuring her lip, as they were parked outside of an elementary school.  51 RR 85–87. Rockwell's child support payments were in arrears, and he did not support their daughter.  51 RR 90–91.

After his arrest, Rockwell started claiming that he suffered from psychosis and other mental health problems.  In its rebuttal punishment case, the State presented evidence from Dr. Xiaoyan Wu, a jail psychiatrist, who diagnosed Rockwell as malingering mental illness and feigning symptoms for secondary gain.  55 RR 141.  For example, Rockwell staged a suicide by overdose attempt, which required officers and medical staff to transport him to a nearby hospital.  51 RR 245–252:2; 52 RR 135.  Inmates use this tactic to manipulate their housing assignments and as a means to leave the jail property to a more vulnerable location such as an ambulance or hospital.  51 RR 251:19–252:2.

16

Although medical personnel tested his blood and found non-life-threatening levels of medication, the next day, officers searched Rockwell's cell and found a rudimentary hand-drawn map depicting the hospital property and the surrounding area. 51 RR 180:17–181:7, 183:15–185:2, 250:4–251:8. In another instance, officers found Rockwell's jail cell flooded. 52 RR 94–96; 54 RR 61–62. Several officers found a homemade weapon that consisted of a razor attached to a handle with tape and wrapped in tissue while cleaning and drying Rockwell's cell. 52 RR 17:18–21, 20–21, 55–56, 104:6–8; 55 RR 183.

### b.   *Mitigating Evidence at Trial*

Trial counsel called 52 witnesses to testify on Rockwell's behalf during punishment. *See* RR vol. 51–52, 54–55. First, jail personnel impeached testimony about the weapon found in Rockwell's cell and highlighted the "suspicious" circumstances surrounding its discovery. 52 RR 98–99, 121–25. A jail lieutenant testified that the only disciplinary matter sustained against Rockwell did not involve violence, and that none of his disciplinary records included an attempted escape. 52 RR 129–30, 137–39. Other jail staff testified that Rockwell was respectful, non-violent, polite, and "a model inmate." *See*, *e.g.*, 52 at 113–15, 54 RR 155, 196, 202, 209:3–5, 219.

Other witnesses, including Rockwell's family members, neighbors, and friends described Rockwell's positive childhood, personality, and character. For example, Renee Dickerson testified that Rockwell treated her son with special needs kindly. 52 RR 185–87. Other witnesses testified that Rockwell was a polite and obedient child. 52 RR 194, 207, 216, 226. Some testified that they never knew Rockwell to be violent and that his crimes were out of character. 52 RR 197, 275–76, 281, 287.

Rockwell's former teachers, teammates, and coaches focused on Rockwell's work ethic, leadership, and involvement in sports. *See, e.g.*, 52 RR 189–90, 196, 203, 214, 224, 230–31, 239, 241–43, 253, 260; 54 RR 21, 25–28. Former customers also testified on Rockwell's behalf. 54 RR 15. Finally, Rockwell's relatives shared memories from Rockwell's childhood and testified to his generosity, the ways he cared for and positively influenced his younger family members, and his relationship with his daughter. *See, e.g.*, 55 RR 24, 52, 75, 124.

c.      *Mitigating Evidence Presented to State Habeas Court*

Rockwell's habeas evidence includes affidavits provided by friends and family members, reports and affidavits given by four experts, medical records, school records, and a death certificate. *See* 1 SHCR 191–92. Generally speaking, the witness affidavits contain good-character evidence about Rockwell, bad-character evidence about his codefendants and his ex-wife, Teresa Jackson, and comments about mental health issues in the family and in Rockwell's mother specifically. *See* 1 SHCR 331–404. The affidavit of Dr. Michael Fuller reflects that he diagnosed Rockwell with "atypical" psychosis in 2013, but also acknowledges that it is possible Rockwell was exaggerating some of his symptoms. 1 SHCR 219. Similarly, Dr. Holly Miller concluded that "Rockwell has both a mental disorder and is malingering or exaggerating symptoms." 1 SHCR 304. Dr. Celeste Henery, an anthropologist, provided a social history of Rockwell's life experience intended to reduce his moral culpability. 1 SHCR 244. Rockwell also retained a pharmacology and neurobiology expert, Dr. Rebecca Cunningham, to provide an affidavit explaining the effects that steroids may have on a person. 1 SHCR 193. Dr. Cunningham stated that it would be impossible to make conclusions about the exact impact of steroid use on Rockwell's behavior because she lacked the necessary subjective reporting from him and clear information about his use. 1 SHCR 199. Dr.

Cunningham concluded, however, that "it is *possible* that [Rockwell] experienced an increase of aggression or other side effects," but that "any such aggression would have been reactive in nature (not 'roid rage') to his surroundings and environment."  1 SHCR 200 (emphasis added).

        3.     <u>Analysis</u>

        *a.*     *Mental Illness (Claim 1)*

In his first claim, Rockwell argues that "[t]he state court unreasonably applied clearly established federal law and unreasonably determined the facts by holding that trial counsel effectively presented his mental illness history in mitigation."  Pet. at 17 (capitalization omitted). Rockwell also asserts that trial counsel unreasonably narrowed the scope of their punishment investigation related to Rockwell's mental illness and should have retained a mental health professional with specific expertise in psychotic disorders.  *Id.* at 20.  Rockwell maintains that this failure prejudiced his mitigation defense.  *Id.* at 39.  Respondent contends that trial counsel's investigation and strategy were reasonable under the circumstances, and "[n]o prejudice accrued from counsel's alleged deficiencies."  Ans. at 28–33.

        i.     <u>*Strickland* Analysis - Prong 1</u>

Trial counsel met with Rockwell within a day of their appointment in April of 2010.  2 SHCR 926; 4 SHCR 1678–79 (Finding Nos. 1, 23).  Moore recalls that Rockwell was "respectful, cooperative, pleasant, logical, articulate, responded appropriately to the subject matter of [the] conversation and was appreciative of [their] efforts."  2 SHCR 926.  Counsel asked Rockwell if he had a history of mental illness, and Rockwell told counsel that he "had no problems or issues in that area," "had never seen a mental health professional or even suspected a need to do so," and "had never suffered with any mental health issues or been prescribed medication for mental health issues."

2 SHCR 926–27; 4 SHCR 1679 (Finding Nos. 20–22). Rockwell's representations were consistent

with trial counsel's observations. 2 SHCR 927. Trial counsel retained psychologist Kelly Goodness

to provide mitigation investigation services and to evaluate Rockwell for intellectual disability,

mental deficiency, and mental illness.[6] 2 SHCR 926. Rockwell communicated with counsel during

the summer months of 2010 and actively assisted in formulating his defense. 2 SHCR 927, 957–62.

In October of 2010, however, Rockwell refused to meet with counsel at the jail. 2 SHCR

928. Trial counsel arranged for Rockwell to be brought to court so they could determine the reason

he refused to see them. While in the court holding cell, Rockwell kept repeating, "I am a federal

prisoner being held against my will . . . I demand to be released on personal bond," or words to that

effect. 2 SHCR 928. Moore recalled that something about Rockwell's demeanor made him believe

that this was not a genuine mental health issue. For example, Rockwell would occasionally glance

at counsel to gauge their responses to his statements. 2 SHCR 928.

Nonetheless, based on the changes in Rockwell's behavior, trial counsel asked the court to

appoint Dr. Barry Norman, a forensic psychologist, to examine Rockwell. 2 SHCR 928. Dr.

Norman examined Rockwell on three separate occasions, interviewed Tarrant County Jail personnel

on four separate occasions, reviewed the Tarrant County Corrections Center medical records, and

interviewed Rockwell's parents. 2 SHCR 973–75 (Norman report). He monitored Rockwell from

October 2010 to January 2011. 2 SHCR 929. Dr. Norman observed that Rockwell denied any

mental health history and that statements made by Rockwell "were not indicative of mental illness."

---

[6] The ABA Guidelines—which are not binding upon this Court—allow for the use of psychologists as mitigation specialists. *See* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.4, cmt. 1003 (2003) (noting that counsel is free to allocate duties imposed by the guidelines to appropriate members of the defense team, with two exceptions inapplicable in the instant case).

2 SHCR 975, 977.  Dr. Norman wrote, "Despite the fact that Mr. Rockwell was behaving oddly

between mid-August 2010 and the end of November 2010, during the time that I spent with him he

displayed no evidence of a disorder which would significantly impair his current understanding of

reality."  2 SHCR 977.  Dr. Goodness also told counsel at this time that she found no mental health

issues and advised counsel not to pursue a mental health mitigation theory.  2 SHCR 929.

In February of 2011, trial counsel had Rockwell evaluated by clinical psychologist and

neuropsychologist, Dr. Michael Chafetz.  2 SHCR 931, 983.  Dr. Chafetz reported that "there is no

clear evidence that [Rockwell] is presenting psychotic symptoms that are invalid, but his symptoms

do not fit the usual criteria for psychotic experience."  3 SHCR 990.  Dr. Chafetz summarized,

"There is some history presented of psychosis, but this does not fit the usual symptomology, and

there is some mild evidence of over-reporting."  3 SHCR 987–96.

Dr. Norman continued to monitor Rockwell from January 2011 through the beginning of voir

dire in September of 2011.  2 SHCR 930.  He provided a written update on September 6, 2011,

including findings that: "No paranoid mentation was noted and no overt delusional material was

elicited from him"; and "[N]o evidence of auditory or visual hallucinations were reported or

observed[.]" 2 SHCR 980.  Dr. Norman's findings were consistent with what trial counsel observed

in their meetings with the defendant.  2 SHCR 930.  In a written report dated September 16, 2011,

acknowledging Rockwell's family history of mental illness, Dr. Goodness advised trial counsel not

to pursue a mental health mitigation theory, stating: "All mental health professionals worth anything

have identified Rockwell as malingering [mental illness].  It would only be more hurtful than helpful

to have mental health testimony."  2 SHCR 929, 971 (Goodness report).

Trial counsel indicated that Rockwell participated daily in the 26 days of jury selection, giving no indication to counsel that he was mentally ill.   Counsel also asked the bailiffs who transported Rockwell every day if they saw any strange behavior from Rockwell, and they said they did not.  2 SHCR 932–33; 3 SHCR 1002–06 (notes between counsel and Rockwell).  Trial began January 3, 2012.  Counsel reported that Rockwell was "attentive, alert, and actively participated" in helping counsel. 2 SHCR 934.  Midway through the punishment phase, however, Dr. Goodness met with Rockwell in the court holding cell and reported that he claimed to be seeing snakes and hallucinating.  2 SHCR 934.  Dr. Goodness asked for an opportunity to examine Rockwell, and the court agreed. 2 SHCR 934–35.   Dr. Goodness then reported that, in her opinion, Rockwell's statements were not consistent with seeing snakes or hallucinations.  2 SHCR 934–36.  Nonetheless, Dr. Goodness recommended that counsel seek a second opinion.  2 SHCR 935.

Thereafter, the trial court asked psychologist Antionette McGarrahan to examine Rockwell. 2 SHCR 935.   In her eight-page report, Dr. McGarrahan observed that "Rockwell reported hallucinations of all kinds, including auditory, visual, tactile, and olfactory, which were all highly suspect, as he presented with no distress when discussing what would be terrifying and extremely disturbing 'experiences' that he claimed to have had of late." 3 SHCR 1008, 1011. Dr. McGarrahan continued, "It should be noted that Mr. Rockwell does not appear to have reported many, if not all, of these 'hallucinations' to mental health personnel or jail staff."  3 SHCR 1115.   As part of her investigation, Dr. McGarrahan also interviewed Rockwell's psychiatrist in jail, Dr. Xiaoyan Wu. 3 SHCR 1113. Dr. Wu told Dr. McGarrahan that Rockwell was "malingering psychiatric symptoma-tology, specifically claims of hallucinations, for secondary gain."  3 SHCR 1114.  Dr. Wu had nevertheless prescribed a very low dose of an antipsychotic because Rockwell was on a hunger

strike, and she thought that giving him the medication he sought would cause him to eat again.  This was, in fact, successful.  3 SHCR 1114.  Dr. McGarrahan did not believe the medication was required to maintain Rockwell's competency, but she recommended he stay on the medication to avoid any further manipulative hunger strikes.  3 SHCR 1118.  Dr. McGarrahan concluded that Rockwell's "presentation" and the "results of standardized psychological testing" evidenced malingering, stating that Rockwell "presently appears to be feigning mental illness for the purpose of avoiding or delaying punishment for his capital murder conviction."  3 SHCR 1116.  The trial judge reported these findings to trial counsel and the trial proceeded.  Counsel passed this information on to Rockwell, and he indicated that he understood.  2 SHCR 935.

Despite the opinions of Dr. Goodness, Dr. Norman, Dr. Chafetz, Dr. McGarrahan, and Dr. Wu to the contrary, Rockwell argues that trial counsel were ineffective for failing to retain an additional mental health professional with expertise in psychotic disorders like schizophrenia.  Pet. at 19.  Specifically, Rockwell argues that trial counsel should have hired experts such as his state habeas experts, psychologist Dr. Holly Miller and psychiatrist Dr. Michael Fuller.  Pet. at 32, 40.  As stated, Dr. Miller concluded that there was "evidence of both mental illness and malingered or exaggerated symptoms."  1 SHCR 303.  She continued, "Rockwell is not a clear-cut case. His interview data, his reliable descriptions of hallucinations, his family history of significant mental illness are consistent with a severe mental illness.  However, he also has elevated measures that indicate that he, at the very least, is exaggerating psychological problems."  1 SHCR 304.  Dr. Fuller similarly found "with a high degree of medical probability" that Rockwell was suffering from "atypical" psychosis, while acknowledging that it was possible Rockwell was exaggerating some of his symptoms.  1 SHCR 219, 222.

Trial counsel recognized Rockwell's potential mental health issues and relied on numerous experts to monitor and assess his mental state during the course of a representation that lasted nearly two years.   Dr. Goodness, a mitigation specialist and psychologist, was particularly qualified to advise counsel on the feasability of a mental-health-based defense strategy.   Counsel also relied on the court's expert, Dr. McGarrahan.   "Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome creates, and rule that his performance was substandard for doing so."   *Smith v. Cockrell*, 311 F.3d 661, 676–77 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); *see Turner v. Epps*, 412 F. App'x 696, 704 (5th Cir. 2011) ("While counsel cannot completely abdicate a responsibility to conduct a pretrial investigation simply by hiring an expert, counsel should be able to rely on that expert to alert counsel to additional needed information . . . .").

In addition to his reasonable reliance on these experts, trial counsel also explained that if they had sought to present a mental illness theory to the jury, Rockwell would have been subject to a potentially "devastating" comprehensive evaluation by the State's mental health experts, and it would have opened up their experts' reports to discovery.   2 SHCR 937, 941.   Counsel feared the State would learn of damaging information such as Rockwell's fraudulently transporting financed cars to Mexico, shooting a gun at his ex-wife's boyfriend, and choking a woman to the point of unconsciousness.   2 SHCR 941–42; 42 RR 160:9–11.

That both Dr. Fuller and Dr. Miller's evaluations revealed malingering undermines Rockwell's argument that trial counsel were ineffective for failing to continue to investigate his mental health for evidence in mitigation.   As trial counsel explained, "A trial strategy of suggesting

24

that a client suffers from mental illness based on the opinions of two experts who would testify that

he is malingering and indicating exaggerated symptoms would be disastrous, ill-advised, ineffective

and incompetent." 2 SHCR 937. After five experts found that Rockwell was competent,

malingering, and not suffering from mental illness, counsel's decision not to seek additional opinions

on the defendant's mental health does not fall outside of the wide range of professionally competent

assistance. The state habeas court reasonably concluded on this record that trial counsel "made

reasonable, strategic decisions not to present evidence that [Rockwell] was mentally ill because Dr.

Kelly Goodness advised the attorneys not to pursue such a strategy." 4 SHCR 1688 (Conclusion

Nos. 1, 11) (citing *Wong v. Belamontes*, 558 U.S. 15, 20 (2009)). Rockwell has not shown the state

habeas court's ruling was unreasonable under § 2254(d).

### ii. *Strickland* Analysis - Prong 2

"Because a convicted defendant must satisfy *both* prongs of the *Strickland* test, a failure to

establish either deficient performance or prejudice under that test makes it unnecessary to examine

the other prong." *Flores v. Johnson*, 957 F. Supp. 893, 910 (W.D. Tex. 1997) (citing *Strickland*, 466

U.S. at 700). The Court examines whether Rockwell has suffered any prejudice from trial counsel's

assistance in an abundance of caution. *See id.* To prove his claim, Rockwell must show that he

suffered prejudice as a result of his trial counsel's alleged failure to investigate and present mental

health evidence. *See Wiggins*, 539 U.S. at 534. To establish prejudice, Rockwell must demonstrate

a "reasonable probability that, but for counsel's unprofessional errors, the result of the [sentencing]

proceeding would have been different." *Id.* "In determining whether a petitioner suffered prejudice,

[the court] compare[s] the evidence actually presented at sentencing with any additional mitigating

evidence presented in the habeas proceeding." *Kunkle v. Dretke*, 352 F.3d 980, 991 (5th Cir. 2003).

25

After reviewing all of the evidence, the court must ultimately "decide whether the additional mitigating evidence was so compelling that there was a reasonable probability that at least one juror could have determined that because of the defendant's reduced moral culpability, death was not an appropriate sentence." *Id.* (internal quotation marks omitted).

Trial counsel's punishment theory focused on how uncharacteristic and atypical this offense was for Rockwell in an effort to prove he would not be a future danger. Moore and Daniel went to "extraordinary lengths to locate positive character witnesses that knew Rockwell," and called an unprecedented 52 witnesses to testify on his behalf during punishment. 3 SHCR 1050. Among them were Rockwell's teachers, teammates, coaches, and family members, each testifying to Rockwell's work ethic, leadership, and generosity. *See, e.g.*, 52 RR 189–90, 196, 203, 214, 224, 231–32, 241–43, 253, 260; 54 RR 21, 25–28. In comparison, a mental health defense attempting to show that Rockwell's criminal behavior is due to an irregular form of psychosis or mental disorder is a double-edged sword that could undercut trial counsel's efforts to show a lack of future dangerousness. And even if the jury were predisposed to view mental illness as entirely mitigating rather than aggravating, both Dr. Fuller and Dr. Miller found that Rockwell was malingering and exaggerating symptoms, which undermines the strength of the theory while damaging the credibility of the defense team.

The State presented evidence of malingering in their rebuttal punishment case and during their closing argument. For example, during the punishment case, the State argued that Rockwell tried to escape jail by staging a fake suicide attempt. *See* 52 RR 135:22–25. The State also called Dr. Wu, Rockwell's jail psychiatrist, who testified that she diagnosed Rockwell as malingering his psychotic symptoms. 55 RR 144:2–5, 150:5–7. Dr. Wu explained to the jury that malingering

26

means feigning symptoms for secondary gain and that it is "very common" in a jail setting.  55 RR

144:11–14.  In its closing remarks, the State argued to the jury that Rockwell faked his alleged

mental health problem and faked a suicide attempt in an effort to escape.  56 RR 14:14–22.  Further

evidence that Rockwell malingered his mental health symptoms, presented by the defense through

Dr. Fuller and Dr. Miller's testimony, would have only served to strengthen these arguments while

at the same time undermining the credibility of the proffered mental-health defense.  Furthermore,

Rockwell does not address the fact that, as discussed, the State could have discovered damaging

information in the course of evaluating Rockwell with its own expert and in the exchange of expert

reports.

　　Based on the foregoing, Rockwell has not shown a reasonable probability that at least one

juror could have determined that, based on his state habeas evidence, death was not an appropriate

sentence.  *See Kunkle*, 352 F.3d at 991.  The mere possibility that one juror could have done so is

outweighed by the aggravating evidence, including Dr. Fuller and Dr. Miller's findings that

Rockwell continued to exhibit malingering, as well as the premeditated and ruthless nature of this

double murder.  *See id.* ("[T]he mere possibility of a different outcome is not sufficient to prevail

on the prejudice prong.") (citing *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997)); 1 SHCR

219.

　　The state habeas court concluded that "evidence attributed to Dr. Fuller and Dr. Miller would

not have made a quantitative difference to jurors in this case given that they would have testified that

their exams and testing indicated that [Rockwell] was malingering or exaggerating his symptoms."

4 SHCR 1691 (Conclusion No. 21).  The Court finds that the state habeas court could reasonably

conclude that "[t]here is no probability that the proposed testimony . . . would have had any effect

on the jury's answer to the mitigation issue." 4 SHCR 1691.  Rockwell fails to show the state habeas court unreasonably determined the facts or applied clearly established law.  The Court **DENIES** Claim 1.

### b.      Steroid-use (Claim 2)

In Claim 2, Rockwell argues that "[t]he state court unreasonably applied clearly established federal law and unreasonably determined the facts in holding that trial counsel did not err in failing to investigate and present evidence of Rockwell's steroid use."  Pet. at 41 (capitalization omitted). Respondent answers that trial counsel "were not deficient in their investigation and presentation, and even if they were, no prejudice accrued."  Ans. at 50.

### i.      *Strickland* Analysis - Prong 1

Rockwell argues that trial counsel failed to adequately investigate and present his steroid use as evidence in mitigation and should have hired an additional expert on steroid use. Pet. at 42–43. The Court will first examine trial counsel's investigation into Rockwell's steroid-use.

After trial counsel learned of Rockwell's illegal steroid use from Dr. Goodness, they retained Dr. Dwain Fuller to "explore what type of evidence [they] might be able to present regarding steroids and whether that information [would] be beneficial."  2 SHCR 947.  Dr. Dwain Fuller is a forensic toxicology consultant with over 29 years of experience in forensic toxicology.  3 SHCR 1021.  He advised trial counsel that they should not pursue a trial strategy based on Rockwell's steroid use because his research did not support "a defense theory that steroid use might cause one to engage in premeditated murder."  3 SHCR 1022.  Pointedly, he states in his affidavit that "[he] found nothing even remotely supporting a theory of steroid use contributing to a planned and premeditated intentional murder of two persons."  3 SHCR 1022.  Trial counsel also observed that, other than

28

finding steroids in the truck that Rockwell used to leave town, they had no information about the type of steroids Rockwell purportedly used, the frequency with which he may have used them, or whether he used them at or near the time of the offense.  2 SHCR 947.  Moreover, counsel recognized that such a defense would have required him to present evidence of another crime, as Rockwell's steroid use was itself illegal.  2 SHCR 947.

Rockwell does not dispute that Dr. Dwain Fuller was qualified to advise counsel on the potential success of using steroid abuse in mitigation.  Rather, Rockwell contends, as he did at the state habeas proceeding, that trial counsel ignored Dr. Dwain Fuller's suggestion that he find another person with specific expertise in steroid use.  Pet. at 42–43.  In fact, Dr. Fuller and trial counsel denied this version of events and state habeas counsel apologized for misrepresenting the facts at the status hearing before Judge Wisch.  1 SHRR 25–29; 2 SHCR 948.  Rockwell therefore fails to provide clear and convincing evidence that Dr. Fuller advised trial counsel to seek additional expertise on the matter.  *See* § 2254(e)(1).

Nevertheless, Rockwell suggests that trial counsel should have hired an expert like Dr. Cunningham, who was more equivocal about the possible use of a steroid defense, even as she acknowledged that she had no factual basis to make any conclusions as to Rockwell in particular.  Pet. at 44; 1 SHCR 199–200.  Federal habeas courts are not required, however, to launch into examinations of "the relative qualifications of experts hired and experts that might have been hired." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014).  The selection of an expert witness is a "paradigmatic example" of the type of strategic choice that, when made after thorough investigation of the law and facts, is "virtually unchallengeable." *Id.* (citing *Strickland*, 466 U.S. at 690–91).  When counsel recognizes that a possible issue requires expert assistance, and counsel employs an expert

at trial, counsel is not ineffective for failing to canvass the field to find a more favorable expert. *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000) (discussing counsel's use of mental health expert), *abrogated on other grounds by Lewis v. Thaler*, 701 F.3d 783, 790 (5th Cir. 2012).  In this instance, Rockwell has not shown that trial counsel acted unreasonably when they hired Dr. Fuller, only that, in hindsight, he would have preferred Dr. Cunningham.

Rockwell also argues that trial counsel overlooked numerous lay witnesses "who could have testified to Rockwell's use of steroids and the changes they observed in him after he began using them."  Pet. at 43.  Specifically, Rockwell names his father Kenneth Rockwell, Valricia Brooks, Bryan Ethley, and Zelven Edwards as the lay witnesses counsel could have called.  *Id.*  Kenneth Rockwell and Valricia Brooks were not overlooked by trial counsel.  They were called to testify in mitigation consistent with trial counsel's character strategy, but not to comment on Rockwell's steroid use. *See*, *e.g.*, 55 RR 45–57, 78–114.  Such complaints of uncalled witnesses are not favored, especially where the decision to present a witness is essentially a strategic one.  *See Gregory v. Thaler*, 601 F.3d 347, 352–53 (5th Cir. 2010) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).  Further, Ethley's affidavit described changes to Rockwell's physical appearance and temperament which he attributed to steroid use, but he did not attribute aggressive or criminal behavior to steroid use.  Rather, Ethley notes that Rockwell kept to himself and was less talkative in the time leading up to his arrest. *See* 1 SHCR 353.  And Edwards would have been a risky witness because counsel learned that "he had assisted Rockwell in taking cars that were financed under Rockwell's auto financing floor plan to Mexico, selling them and then reporting them as stolen. [Trial counsel] did not feel that sponsoring evidence that [their] client committed bank fraud was a wise decision or an effective mitigation strategy." 2 SHCR 944–45.  Thus, the state court could have

30

reasonably determined that effective counsel would not sponsor a witness who had committed crimes with Rockwell or who suspected steroid use but did not attribute any aggressive behavior to it.  2 SHCR 947; *see Gregory*, 601 F.3d at 352 (holding that ineffective-assistance claim based on uncalled witnesses must show that witness's testimony would have been favorable).

Rockwell argues, however, that "even if trial counsel thought that Rockwell's steroid use would not have been compelling mitigation evidence, there was no reason not to present evidence of steroid use . . . because the jury already heard about Rockwell's steroid use during co-defendant Chance Smith's testimony" in the punishment phase of trial.  Pet. at 43; *see* 51 RR 48:9–49:10. Smith, when questioned by the defense, did testify briefly that he believed steroid use may have contributed to Rockwell's behavior.  51 RR 48:17–49:4.  This "why not?" argument is insufficient, however, to carry his burden to affirmatively show that trial counsel's strategy not to present such evidence fell outside of the wide range of professionally competent assistance.  Again, Dr. Fuller found nothing in his research "remotely supporting" a theory of steroid use contributing to a planned and premeditated intentional double murder.  3 SHCR 1022.  The Court will not second-guess trial counsel's mitigation strategy, which followed a reasonable investigation into steroid use and its effects.  *See Bower*, 497 F.3d at 467.  The state court's ruling on this issue was not unreasonable in fact or law.

ii.     *Strickland* Analysis - Prong 2

Although the Court has determined that Rockwell fails to establish the unreasonableness of the state court ruling as to counsel's representation, the Court examines whether Rockwell has suffered any prejudice from trial counsel's assistance in an abundance of caution.  *See Flores*, 957 F. Supp. at 910 (citing *Strickland*, 466 U.S. at 700).  Rockwell argues that he was prejudiced by trial

31

counsel's failure to call steroid expert Dr. Cunningham or lay witness friends and family members to testify in mitigation regarding his steroid use.  Pet. at 43–44.  "In determining whether a petitioner suffered prejudice, [the court] compare[s] the evidence actually presented at sentencing with any additional mitigating evidence presented in the habeas proceeding."  *Kunkle*, 352 F.3d at 991.

First, as previously noted, trial counsel produced 52 witnesses and focused on highlighting Rockwell's "acts of kindness, leadership, character, lack of criminal history, and his [good] behavior while in custody." 2 SHCR 934.  Emphasizing Rockwell's illegal steroid use, through either lay or expert witnesses, would compromise trial counsel's strategy of focusing on Rockwell's acts of kindness and his lack of criminal history.  2 SHCR 934.  Further, Ethley did not attribute aggressive behavior to Rockwell's steroid use.

Second, in preparing her opinion, Dr. Cunningham consulted with Rockwell's habeas counsel and reviewed affidavits from Rockwell's friends and family that indicate their belief that Rockwell used steroids regularly leading up to the time of his arrest.  1 SHCR 194.  Still she believed it was impossible to make conclusions about the exact impact of a particular steroid on Rockwell's behavior.  She opined merely that it was "possible" he had experienced an increase of aggression and noted that "any such aggression would have been reactive in nature," which tends to dispel the notion that steroids caused the proactive behavior of planning a robbery.  1 SHCR 200.  Thus, the mitigating impact of Dr. Cunningham's opinion, if any, is very weak.

Finally, trial counsel's affidavit aptly describes the harm that could come from presenting such a "doomed" theory to the jury:

> First, there was no factual foundation supporting the type of steroids Rockwell used, his frequency of usage, or that he was using steroids at or near the time of the offense.  The prosecution would have cross examined this steroids expert on whether

steroids make[] a person plan and rehearse a murder, try to burn someone's house down, attempt a carjacking on someone to take their money, buy gloves, ski masks, hooded jackets, try to set a crime scene on fire to destroy evidence, throw a murder weapon and clothing in a river, arrange for the vehicle used in the crime to be towed to an auto auction, meet at a location after the offense with two other co-conspirators, acquire another gun after the offense, flee to Mexico with the identical implements of [the] crime that were used on the original offense, and manipulate the police during interviews.

2 SHCR 948–49; 3 SHCR 1051–52. At a minimum, the likely cross-examination by the State would have damaged the defense team's credibility in the eyes of the jury.

In sum, the theory that Rockwell was a long-time user of illegal steroids would have discredited defense counsel's efforts to present Rockwell as an otherwise decent man and solid citizen. And considering the weakness of Rockwell's habeas evidence on this issue, including Dr. Cunningham's conclusion that it is uncertain whether Rockwell experienced increased aggression in the months preceding the crime and whether steroids contributed to any such aggression, Rockwell fails to show that the state court unreasonably rejected his claim of prejudice. *Kunkle*, 352 F.3d at 991; 4 SHCR 1707 (Finding of Fact No. 5). Accordingly, Rockwell fails to show that the state habeas court unreasonably determined the facts or unreasonably applied clearly established law when it concluded that Rockwell "failed to show that there was a reasonable probability that he would have received a life sentence[], had trial counsel presented evidence that he used steroids." 4 SHCR 1709 (Conclusion No. 5). The Court **DENIES** Claim 2.

### c.    *"Mastermind" Evidence (Claim 3)*

In his third claim, Rockwell argues that "the state court unreasonably applied clearly established federal law and unreasonably determined the facts by holding that trial counsel were effective despite failing to show that Rockwell was not the mastermind of the crime." Pet. at 46

(capitalization omitted).  Rockwell argues that trial counsel should have called Dr. Chafetz to testify

about Rockwell's impairments in mental processing and problem solving, should have introduced

records showing his enrollment in special education for fifth through seventh grade, should have

called family members to testify they saw him "struggle in school," and should have called his high

school friend, Chris Norwood, to testify that Rockwell had trouble remembering the plays when the

two played football together.  Rockwell also contends counsel should have further impeached co-

defendant Smith's character for truthfulness with opinion testimony from Rockwell's family and

friends.  Pet. 48–50.  There is a reasonable probability, Rockwell argues, that evidence he "was

unlikely to be the person who planned and formulated the crime because of his mental and

intellectual limitations" would have impacted both the guilt and punishment phase deliberations.

Pet. at 48, 50.  Respondent contends this claim was reasonably rejected.

### i.  *Strickland* Analysis - Prong 1

To establish that counsel were ineffective due to failure to investigate the case or discover

evidence, Rockwell must do more than merely allege a failure to investigate: he must state with

specificity what the investigation would have revealed, what specific evidence would have been

disclosed, how the evidence would have been disclosed, and how the evidence would have altered

the trial. *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994); *Nelson v. Hargett*, 989 F.2d

847, 850 (5th Cir. 1993).  The Court begins its analysis with trial counsel's investigation and strategy

for presentation of Rockwell's mental capacity.

As previously explained, trial counsel retained Dr. Chafetz to perform neuropsychological

testing on Rockwell.  3 SHCR 1035.  Dr. Chafetz performed 22 separate psychological tests on

Rockwell.  2 SHCR 983.  Dr. Chafetz found that most of Rockwell's scores centered around the

low-average to average range.  3 SHCR 990.  Many of Rockwell's scores indicated to Dr. Chafetz

that he suffered from internal distress more than "actual dysfunction," and he noted that Rockwell

was "somewhat older than the onset age for the kinds of psychoses" that he claimed to be

experiencing.  3 SHCR 989–90, 992.  Dr. Chafetz also reported that Rockwell graduated high school

with mostly Cs and Bs, he was the high school quarterback, and he held several jobs before attending

junior college for a short period of time on a football scholarship.  He worked in fast-food restaurants

and in telemarketing before joining a car wash business.  He worked his way up to manager and then

left the business to start his own business selling car wash chemicals to car dealerships.  From there,

he began selling cars and was promoted to finance after several years.  He became a Sales/Finance

Director for Voltech and General Manager/Partner at Moncomp.  By the time he was arrested in

April of 2010, he was the co-owner of Save-U-Lot and, in that capacity, he hired employees,

acquired inventory at the auto auction, and secured "floor plan" financing for the dealership.  2

SHCR 985; 3 SHCR 1055.  Trial counsel also had Dr. Norman's report of January 17, 2011, in

which he opined that Rockwell "displayed an ability to manipulate information and plot strategy."

2 SHCR 975.

Given these expert opinions, trial counsel believed that "pursuing an 'inability to plan'

strategy would have been unethical and unsupported by credible evidence"; that calling a former

teammate to testify that Rockwell could not remember football plays . . . would have sounded

"desperate"; and that a more effective strategy would be to show that Rockwell was "kind and decent

to others less fortunate, a leader in the classroom, and a leader on the football field."  3 SHCR 1040,

1054.  Rockwell does not identify what further investigation would have revealed, what evidence

would have been disclosed, how it would have been disclosed, or how it would have altered the trial.

35

On the contrary, trial counsel were aware of Dr. Chafetz's opinions and chose to present a mitigation case highlighting Rockwell's positive attributes.

Trial counsel did not interview Norwood, Rockwell's highschool friend, during their investigation because none of their other potential witnesses, including Rockwell, mentioned him. 2 SHCR 944; *see Johnson v. Cockrell*, 306 F.3d 249, 252–53 (5th Cir. 2002) (noting that the court of appeals has consistently refused to hold attorneys responsible for introducing mitigating evidence that the client and other witnesses fail to disclose). Rockwell does not articulate what additional investigation trial counsel should have undertaken to discover Norwood's testimony. Trial counsel's investigation produced 52 witnesses to testify positively on Rockwell's behalf.

Rockwell also attacks trial counsel's failure to call witnesses to testify to Chance Smith's negative reputation for truthfulness. Pet. at 49. Counsel did not overlook the need to impeach Smith's testimony. Indeed, counsel interviewed him six different times before trial and visited the crime scene three times to ascertain what Smith could see from where he claimed to be located as the lookout during the offense. 3 SHCR 1056. Because Smith received a relatively lenient sentence of 20 years, Rockwell argues, the jury may have doubted his testimony which painted Rockwell as the mastermind of the crime, and thus leaned in favor of assigning a life sentence. Pet. at 51. Notably, however, video surveillance, text messages, and physical evidence corroborated much of Smith's testimony. Thus, even if trial counsel successfully discredited Smith's character for truthfulness, the jury would have likely believed him because of the extensive corroborating evidence.

Given trial counsel's thorough investigation into Rockwell's mental capacity, this claim essentially boils down to a disagreement with counsel's chosen strategy to focus on Rockwell's

36

positive characteristics rather than any mental deficiency.  Pet. at 49.  "[T]here are countless ways to effectively represent a capital defendant," and counsel's selection of a strategy is generally unchallengeable.  *See Pinholster*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at 689); *Bower*, 497 F.3d at 467; *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997).  Here, trial counsel believed that "Dr. Chafetz would never have allowed himself to be placed in a position to say something so ridiculous and unsupported" as "Rockwell [] could not have planned this robbery and double murder."  2 SHCR 950.  Dr. Chafetz was familiar with Rockwell's work history and knew that he had worked his way up in the auto industry to eventually owning his own businesses.  2 SHCR 985.  During their interactions with Rockwell, trial counsel found him to be "polite and articulate," and noted his "polished social skills."  3 SHCR 1031.  Counsel clearly believed, based on their investigation, that a strategy presenting Rockwell as having no ability to plan the robbery would have been untenable.  3 SHCR 1055.

"These are the difficult and nuanced decisions the trial lawyer must make.  That they were not successful does not make them unreasonable."  *Granados v. Quarterman*, 455 F.3d 529, 536 (5th Cir. 2006).  Based on the record, the state habeas court determined that trial counsel's investigation and strategy did not fall outside of the wide range of professionally competent assistance.  4 SHCR 1710–14.  The Court concludes that the habeas court's determination was not an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts.

ii.    *Strickland* Analysis - Prong 2

Although Rockwell fails to establish the unreasonableness of the state court ruling as to counsel's investigation and strategy, the Court, in an abundance of caution, examines the state

court's prejudice determination with respect to both phases of trial.  Rockwell's argument regarding the guilt phase fails because any evidence refuting his role as mastermind would not have refuted evidence that firmly established his guilt as a party.  3 CR 634, 636–37; *Rockwell*, 2013 WL 6529575, at *3 (holding there was sufficient evidence to prove Rockwell guilty as a party to the offense).  Rockwell co-owned the business next to the victim's gas station and was familiar with their employees and their schedule.  42 RR 163, 165.  He also participated in prior botched attempts to rob the Vos.  42 RR 169; 51 RR 14–19, 21–25.  A forensic video analyst who viewed the recording of the robbery testified that the shooter and first person to enter the Valero was, like Rockwell, a left-handed, dark-skinned African-American man.  43 RR 114:14–24.  Rockwell also paid to have the vehicle that was used during the crime towed to a property owned by his cousin. 45 RR 129:25–130:8, 143–44, 168 (Tow invoice).  The State also introduced Smith's testimony that he contacted Rockwell via text message and tried to withdraw from the robbery scheme in the days and weeks before the crime.  44 RR 158:16–19.  Rockwell's ex-wife testified that the day before the offense he told her that he would pay part of the $30,000 that he owed her for unpaid child support. 51 RR 83, 90:23–91:1.  DNA on a sweatshirt seen on the security footage, and found in the river behind Rockwell's apartment, also strongly implicated Rockwell in the crime. 47 RR 74 (DNA evidence admitted), 163–66.  Rockwell also fled when approached by police four days after the offense and, at the time of his arrest, was in possession of a pistol, three cell phones, two black ski masks, two black beanie caps, a two-way radio, a pair of black gloves, and a check made payable to Valero dated March 27, 2010.  43 RR 199; 55 RR 210:7–13.  This evidence in the record is sufficient to prove that Rockwell participated in the offense as a party, even if it were shown he was not the mastermind.

Furthermore, the proposed testimony from family and friends, particularly the testimony from Norwood that Rockwell had trouble remembering football plays, was not consistent with trial counsel's chosen strategy at sentencing.  Pet. at 49; 1 SHCR 361.  Such testimony, according to counsel, would have "decimated a significant amount of a compelling punishment case presentation" that trial counsel had prepared, including an investigation that "supported a young boy who was kind and decent to others less fortunate, a leader in the classroom, and a leader on the football field."  2 SHCR 950.  Trial counsel believed that if they called Norwood and Rockwell's family members to testify that Rockwell did not have the mental ability to plan the crime, the coaches, teachers, and educators who testified so positively about Rockwell would become witnesses for the State to rebut Norwood's testimony.   2 SHCR 950–51.   The resulting cross-examination would have overshadowed the impact of the witnesses' good-character testimony and would have emphasized and further strengthened the State's already substantial "mastermind" evidence.

As already noted, a trial strategy based on Rockwell's mental capabilities would have also subjected Rockwell to a comprehensive examination by the State's chosen mental health expert.  As trial counsel explained, "allowing the prosecution full access to [Rockwell]" would have "had devastating results."  2 SHCR 937, 950; *c.f. Williams v. Stephens*, 761 F.3d 561, 568–69 (5th Cir. 2014) (considering whether counsel was ineffective by "opening the door" for State's mental health expert to interview the defendant and offer rebuttal testimony).  And, through discovery, the State likely would have received Rockwell's own expert reports, which easily impugn any "inability to plan" strategy.

For the foregoing reasons, the evidence that Rockwell now proffers to show he was mentally incapable of acting as the mastermind of this capital murder is irrelevant to the issue of guilt, as the

jury would have been authorized to convict him as a party, and would have been easily refuted by the State and damaging to counsel's chosen strategy at sentencing.  Rockwell fails to show that the state court was unreasonable in its conclusion that he failed to undermine confidence in the trial and punishment outcomes.  *Strickland*, 466 U.S. at 690.  The Court **DENIES** Claim 3.

> d.    *Theresa Jackson's Testimony (Claim 4)*

In his fourth claim, Rockwell argues that "the state court unreasonably applied clearly established federal law and unreasonably determined the facts by holding that trial counsel was effective despite failing to rebut the testimony of Teresa Jackson," his ex-wife.  Pet. at 53 (capitalization omitted).  The state habeas court denied this claim.  4 SHCR 1727–29.

During trial counsel's pre-trial investigation, Moore met with Jackson and her current husband for several hours.  2 SHCR 954.  At the interview, trial counsel learned of Jackson's "prolonged disdain" for Rockwell, multiple violent incidents between the two, and the fact that Rockwell owed Jackson more than $30,000 in child support.  2 SHCR 954.  In this meeting, and during her testimony at trial, Jackson's disdain for Rockwell was readily apparent.  2 SHCR 954. Jackson also told counsel about an incident where Rockwell fired a gun at her and her husband in a Sam's Warehouse parking lot, which she did not testify about at trial.  2 SHCR 954.

Jackson testified on behalf of the State during the punishment phase of Rockwell's trial.  51 RR 82–110.  To illustrate allegations of Rockwell's violent or abusive nature, the State offered testimony from Jackson that in 2004, Rockwell hit Jackson with DVDs laying on the floor of her car, cutting her lip, as he picked up their daughter from school.  51 RR 85.  Jackson testified that Rockwell pleaded guilty to the offense and received probation.  51 RR 85.  In another altercation, Jackson discovered that Rockwell was cheating on her when she found business cards with what she

believed were women's phone numbers on the back.  51 RR 88.   When Rockwell found out that she had the business cards, he unplugged the phones from their house, put them in his truck, came back into the house, turned off the lights, and pointed a gun at her until she agreed to give the cards back to him.  51 RR 88–89.  Finally, she testified that Rockwell had no relationship with their daughter. 51 RR 84.

Trial counsel attempted to reduce the impact of Jackson's testimony on cross-examination. Trial counsel elicited from Jackson that she refused to take Rockwell's calls when he attempted to see his daughter, that the gun incident in 2004 was charged as a misdemeanor, and that Rockwell provided financially for Jackson while she was pregnant.  51 RR 98–106.  Jackson also admitted that she has a temper.  51 RR 106.  Trial counsel further elicited from Jackson that she did not call the police when Rockwell pointed a gun at her and she stayed with him for four more years following the incident.  51 RR 105.  During the defense's punishment case, trial counsel called witnesses to rebut Jackson's testimony regarding Rockwell's violent nature. *See*, *e.g.*, 55 RR 53–54.  Rockwell's cousin Valricia Brooks, stepmother Vanessa Ethley, and aunt Linda Sneed testified on his behalf and echoed the sentiments of other witnesses: Rockwell was a good father, saw his daughter as often as he could, and acted as an older brother to his cousins and less fortunate family members.  Trial counsel also emphasized problems with Jackson's testimony during their closing argument, including her inherent bias as his ex-wife.  56 RR 36.

Still, Rockwell argues that he was prejudiced by trial counsel's failure to call additional witnesses, and further question those who were called, to rebut Jackson's testimony and cast doubt on her credibility.  Pet. at 53, 55–56.  Specifically, he argues that trial counsel should have further questioned Brooks, Ethley, and Sneed during their trial testimony.  Brooks, who had known Jackson

for many years, stated in her habeas affidavit that Jackson and her husband attacked Rockwell at a Walmart, after which Rockwell wanted to get custody of his daughter.  1 SHCR 337–38.  Ethley declared in her affidavit that she and Jackson were once very close, that Jackson was manipulative and controlling in her relationship with Rockwell, and that Jackson would prevent Rockwell's mother from visiting their daughter.  1 SHCR 355–56.  Ethley also rebutted Jackson's testimony that Rockwell did not provide for their daughter.  1 SHCR 356.  In her affidavit, Sneed declares that Jackson told her, "if she could not have [Rockwell], no one could."  1 SHCR 385.

Rockwell also argues that trial counsel should have called additional witnesses to impeach Jackson, including Leanne Brooks, Shari Turner, and Jerri Williams.  Pet. at 56–57.  In her affidavit, Leanne Brooks describes Jackson as "conniving" and states that Jackson prevented Rockwell from seeing their daughter.  1 SHCR 332.  Turner describes Jackson as "greedy" and "not good news." 1 SHCR 389.  She also states that Jackson would not let Rockwell see their daughter.  1 SHCR 389. In the same vein, Williams  declares that Jackson tried to keep Rockwell from seeing their daughter. 1 SHCR 399–400.

Initially, the Court notes that decisions regarding the extent and manner of cross-examination are strategic in nature and generally will not support an ineffective assistance claim.  *See Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002).  Also, counsel did not fail to cross-examine or impeach Jackson; Rockwell simply claims counsel should have done "more."  Thus, this claim is one "of degrees."  Such claims risk incorporating the distorting effects of hindsight and are accordingly "less susceptible to judicial second-guessing."  *See Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)).

Nevertheless, Rockwell argues that had counsel presented these witnesses' proffered testimony, "it is highly likely" that at least one juror would have voted for a life sentence rather than death. Pet. at 58–59. Rockwell's claim fails, however, because trial counsel developed much of the suggested testimony during their punishment presentation. Trial counsel raised Jackson's inherent conflict of interests as Rockwell's ex-wife. Valricia Brooks testified that Rockwell cared for his daughter, kept a room for her in his home, and that it would be "absolutely false" to say he didn't have a relationship with his daughter. 55 RR 49–53. Javon Anderson and Nick Rockwell, Rockwell's younger brother, testified similarly. 55 RR 75, 129–30. Furthermore, none of Rockwell's suggested witnesses could rebut Jackson's claim that Rockwell was $30,000 behind in child support payments, an issue the State highlighted throughout punishment as the motive for this offense. *See*, *e.g.*, 51 RR 83 (State's counsel questioning Jackson); 55 RR 39 (State's counsel cross-examining witness on the importance of paying child support); 55 RR 130 (same); 56 RR 14 (State's counsel raising child support during closing argument). Moreover, even if the jury discredited Jackson's testimony, none of Rockwell's proposed witnesses could dispute Rockwell's misdemeanor conviction for assault. Finally, further impeachment or pointed cross-examination could have caused Jackson to bring up the event where Rockwell shot at her in the parking lot.

Considering the cumulative nature of much of these witnesses' testimony concerning Rockwell's relationship with his daughter, trial counsel's decision not to present their testimony does not undermine the Court's confidence in the outcome of the proceedings. Although Rockwell suggests that trial counsel should have impeached the credibility of Jackson's testimony that Rockwell disconnected her phones and pointed a gun at her, he provides no evidence that her recounting of these events is untrue. The Court will not speculate about the effect of additional

43

cross-examination and cumulative impeachment testimony regarding Jackson's "vindictive" and

"conniving" nature as compared to the victims' families' testimony about the loss of their loved-ones

and the brutal, calculated nature of Rockwell's crime.  *See Castillo v. Stephens,* 640 F. App'x 283,

292 (5th Cir. 2016), *petition for cert. filed,* (May 10, 2016) (holding that speculating about the effect

of tinkering with trial counsel's cross-examination is exactly the sort of hindsight that *Strickland*

warns against).

Rockwell fails to demonstrate that the state court's rejection of this claim was unreasonable.

The Court **DENIES** Claim 4.

### e.      *Appellate Counsel and Voir Dire (Claim 5a & 5b)*

In his fifth claim, Rockwell argues that the state court unreasonably applied clearly

established federal law and unreasonably determined the facts by: (1) affirming on direct appeal the

trial court's denial of three challenges for cause ("claim 5a"); (2) holding in the habeas proceeding

that appellate counsel was effective ("claim5b").  Pet. at 59.  Respondent maintains that the state

court reasonably denied these claims for relief.  *Id.* at 79.

### i.      Background

These related claims are based on the intersection of the law of parties and the constitutional

requirement that the death penalty may not be imposed on a defendant who "aids and abets a felony

in the course of which a murder is committed by others but who does not himself kill, attempt to kill,

or intend that a killing take place or that lethal force will be employed."  *Enmund v. Florida*, 458

U.S. 782, 797–98 (1982).  In this case, the jury was permitted to find Rockwell guilty in the

following circumstances:

If, in the attempt to carry out a conspiracy to commit one felony, another felony is

committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that *should have been* anticipated as a result of the carrying out of the conspiracy.

3 CR 634 (emphasis added); *see* Tex. Penal Code § 7.02(b). Because the charge permitted the jury to find Rockwell guilty upon the belief that he should have anticipated that a life would be taken, the jury was given the so-called "anti-parties" special issue, which it had to answer in the affirmative before a death sentence could be assessed. *See* Tex. Code Crim. Proc. art. 37.071, § 2(b)(2) (also, "special issue no. 2"). In accordance with *Enmund*, the anti-parties issues asks "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." *Id.*; 3 CR 692. Thus, the prospective jurors in this case were required to: (1) be open to the possibility of finding a defendant guilty of capital murder under the law of the parties, but (2) determining that the defendant may not have intended to kill, nor anticipated a life would be taken. *See Morgan v. Illinois*, 504 U.S. 719, 735 (1992) (holding that a juror who would automatically vote for the death penalty in every case is removable for cause); *see also Lagrone v. Cockrell*, No. 02-10976, 2003 WL 22327519, at *11 (5th Cir. Sept. 2, 2003) (providing that trial courts "should grant a challenge for cause when a prospective juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'") (citing *Adams v. Texas*, 448 U.S. 38, 45 (1980)).

During jury selection, trial counsel challenged jurors on the ground that they had a bias against the law, after they purportedly expressed that they would automatically answer the anti-parties issue "yes" if they found Rockwell guilty of capital murder. After utilizing all of their

statutory peremptory strikes to remove these jurors, trial counsel requested and was granted two additional strikes.  35 RR 12–13.  Trial counsel used the additional strikes and requested a third additional strike for Juror Stephens.  35 RR 13–15.  The trial court denied that request, and Stephens sat as the twelfth juror in Rockwell's trial.  35 RR 15.  Appellate counsel David Richards appealed the trial court's denial of the challenges for cause as to only three of the veniremen challenged by trial counsel, Jurors Knox, Ranney, and Castleberry.  In its opinion on direct appeal, the CCA rejected the claim that the trial judge erred in denying these challenges, reasoning that all three jurors vacillated in their answers to questions about the anti-parties issue.  *Rockwell*, 2013 WL 6529575, at *5–6.  The Court addresses Rockwell's challenge to this ruling on direct appeal as claim 5a.

Then, in his state habeas application, Rockwell argued that Richards had been ineffective for failing to appeal the denial of eight *additional* challenges for cause lodged by trial counsel for the same reason.  1 SHCR 158.  The state habeas court ruled that Richards was not deficient for failing to appeal these additional eight rulings and that Rockwell failed to show any resulting prejudice from Richards's failure to do so.  4 SHCR 1744.  The Court addresses Rockwell's challenge to the habeas ruling as claim 5b.

ii.    Claim 5a

During their examination by the defense, Knox, Ranney, and Castleberry each expressed confusion over how a defendant could assist or promote a capital murder, but not anticipate that a human life would be taken.  *See* 9 RR 251–52 (Knox); 11 RR 129 (Ranney); 25 RR 329 (Castleberry).  However, during the State's examination, each of the veniremembers indicated they would "let the facts and evidence guide" them, and could distinguish between cases in which a defendant *should have* anticipated, but *did not actually* anticipate, that a life would be taken under

the law of the parties. *See* 9 RR 290–92 (Knox); 11 RR 98–99 (Ranney); 25 RR 281–83 (Castleberry). The CCA found that the veniremembers' "prejudices, if any, were not so clear as to make the trial court's decision an abuse of discretion" and overruled each of these claims. *Rockwell*, 2013 WL 6529575, at *6. Because these jurors were vacillating, the trial court was within its discretion to deny the challenges for cause. *See Wainwright v. Witt*, 469 U.S. 412, 443–44, 428 n.10 (1985) (holding that federal law affords trial courts great deference in determining whether vacillating veniremembers are qualified to serve as jurors). Rockwell asserts in his petition that the jurors did not vacillate, but in doing so he simply fails to acknowledge the evidence to the contrary. Pet. at 64–65. Rockwell does not demonstrate that the CCA's ruling on appeal is unreasonable in fact or law. The court **DENIES** claim 5a.

### iii.    Claim 5b

Rockwell next asserts that Richards was ineffective for failing to appeal the denial of eight additional challenges for cause that trial counsel lodged for the same reason. Pet. at 60–61. The standard for evaluating the performance of appellate counsel is *Strickland*. Rockwell must show that: (1) appellate counsel overlooked a non-frivolous issue; and (2) appellate counsel's deficient performance prejudiced him, meaning he would have prevailed on appeal but for appellate counsel's deficient performance. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Id.* at 288; *Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2004).

Because the court awarded trial counsel two extra peremptory strikes, appellate counsel needed to show the erroneous denial of three challenges for cause in order to demonstrate the

47

wrongful deprivation of one peremptory challenge.  In his affidavit, Richards states that he chose to

appeal the rulings as to Knox, Ranney, and Castleberry because Richards believed that Knox,

Ranney, and Castleberry made the strongest statements indicating their inability to answer the anti-

parties special issue "no." 2 SHCR 915.  Richards further believed that "[a]ny additional argument

with respect to the eight veniremembers mentioned in the writ would have been extremely weak, and

. . . frivolous, and would have detracted from the three stronger, legitimate issues presented." 2

SHCR 915.  The state habeas court reviewed the voir dire examination of the eight challenged jurors

and found that "all eight of the venire members at issue in this claim stated that they could follow

the law and would render a verdict based on the evidence." 4 SHCR 1731–39, 1740 (Finding of Fact

No. 25).  The state court explained that the hypothetical presented to the eight prospective jurors by

trial counsel concerned the law of parties under penal code section 7.02(a) not 7.02(b).  4 SHCR

1740 (Finding of Fact Nos. 22–24).  Thus, they were not disqualified under *Enmund*.[7]  The state

habeas court therefore concluded that Rockwell failed "to establish that appellate counsel's strategic

decisions were objectively unreasonable . . . ." 4 SHCR 1743–44 (Conclusion No. 14, 16).

Rockwell argues that the eight challenges for cause were "equally well founded as the three

appealed by appellate counsel" but he fails to acknowledge that trial counsel's hypothetical involved

section 7.02(a) rather than 7.02(b).  While Richards certainly could have forced the CCA to sift

through the record on eight additional challenges for cause in the hope that they found three

reversible rulings, the Constitution does not require a shotgun approach.  In fact, such an approach

---

[7] A conviction under the law of parties in section 7.02(a) does not present an *Enmund* problem in this case because 7.02(a) required the jury to find that Rockwell acted "with intent to promote or assist in the commission of the offense" and that Rockwell "solicited, encouraged, directed, aided, or attempted to aid" in the commission of the offense, which is the functional equivalent of an affirmative finding to the anti-parties issue. 3 CR 634, 636; *see Valle v. State*, 109 S.W.3d 500, 503–04 (Tex. Crim. App. 2003).

undermines appellate counsel's credibility because the hallmark of effective advocacy is winnowing out weak claims and focusing on the ones likely to prevail. *Smith v. Murray*, 477 U.S. 527, 536 (1986); *see also Jones*, 463 U.S. 745, 751–53 (1983) (holding appellate counsel is only constitutionally obligated to raise and brief those issues that are believed to have the best chance of success). Rockwell fails to show that the state court's ruling regarding counsel's choice of appellate claims was unreasonable.

Rockwell also fails to show that the state court was unreasonable in its conclusion that he failed to establish prejudice based on appellate counsel's alleged deficiency. Rockwell does not show that the CCA would have found any of the additional eight grounds for appeal meritorious. Rockwell argues only that the eight challenges for cause "were equally well founded as the three appealed by appellate counsel," which is to say, they were not well founded at all. Pet. 62. The CCA affirmed the denial of the three "similar," if not stronger, grounds for appeal. Pet. at 61 ("Appellate counsel failed to appeal . . . denial of challenges for cause for eight other prospective jurors who answered *similarly*.") (emphasis added).[8] Each of the eight veniremembers at issue in this claim testified that they could follow the law, would be guided by the evidence, and would not automatically answer special issue No. 2 in the affirmative after convicting.[9]

Accordingly, Rockwell fails to establish a reasonable probability that he would have been successful on appeal had appellate counsel appealed the denial of trial counsel's motions to strike the additional eight veniremembers. When viewed through the doubly deferential lens of the

---

[8] 10 RR 172 (Toms); 12 RR 80 (Baker), 201 (Harris); 14 RR 350 (Jones); 18 RR 218–19 (Bellamy); 22 RR 74–75 (Palmer); 27 RR 321 (Cage); 33 RR 122 (Stephens).

[9] 10 RR 121:23–25 (Toms); 12 RR 31:9–25 (Baker), 180:23–25, 174:17–20 (Harris); 14 RR 310:19–23 (Jones); 18 RR 168:4–11, 168:12–23, 172:18–22 (Bellamy); 22 RR 33:13–34:3 (Palmer); 27 RR 266:11–267:5, 287:10–24 (Cage); 33 RR 134:18–135:13 (Stephens).

AEDPA, Rockwell fails to establish that the state court unreasonably determined the facts or applied clearly established federal law in overruling his claim against Richards.  The Court **DENIES** Claim 5b.

### C.     Claim 6 (Mental Illness as Execution Bar)

In his sixth claim, Rockwell argues his execution is barred under the Supreme Court opinion in *Atkins* because, although he is not intellectually disabled, he has schizophrenia, which affects him in much the same way.  Pet. at 66; *Atkins v. Virginia*, 536 U.S. 304 (2002).  Respondent asserts that *Atkins* has not been extended to the mentally ill in this Circuit and, in any case, that Rockwell is not mentally ill.  Ans. at 79–83.

The state habeas court reviewed the findings of Drs. Goodness, Norman, and Chafetz and found that Rockwell is not "mentally retarded" nor does he claim to be.  4 SHCR 1748.  The state habeas court concluded that no court has extended *Atkins* to exempt a person with mental illness from execution and recommended relief be denied.  4 SHCR 1748–49.  The CCA adopted the findings and denied relief, with one judge dissenting on this issue.  *Rockwell*, No. WR-80,232-01 (Tex. Crim. App. Dec. 17, 2014) (Price, J., concurring and dissenting).

In *Atkins*, the Supreme Court held that the Eighth Amendment prohibits the execution of individuals with intellectual disability.  *Atkins*, 536 U.S. at 320–21.  The Fifth Circuit has rejected the argument that *Atkins* extends to defendants with mental illness.  *See Ward v. Stephens*, 777 F.3d 250, 269 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 86 (2015); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014).  Rockwell therefore fails to demonstrate that the state court's rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law.  The Court **DENIES** Claim 6.

**D.     Claim 7 (Mitigation Special Issue)**

In his seventh claim, Rockwell argues that Texas's statutory mitigation instruction violates the Eighth Amendment because it prevents the jury "from giving effect to any category of mitigation evidence that did not specifically relate to Rockwell's 'moral blameworthiness.'"  Pet. at 74; Tex. Code Crim. Proc. art. 37.071, § 2(f)(4).  Rockwell asserts that, under Texas's definition of mitigating evidence, his jury could not consider evidence that he was a talented athlete, a dedicated and hard worker, and a good child.  Pet. at 69.  The state habeas court found that Rockwell's jury was instructed in accordance with the Texas statute and rejected the argument that the statute unconstitutionally limited the type of evidence the jury could consider in mitigation.  4 SHCR 1749–51.  Respondent contends the CCA's ruling was fully consistent with Supreme Court and Circuit precedent.  Ans. at 83.

The trial court's mitigation instructions to the jury state:

In deliberating on the issues submitted, the jury shall consider *all evidence* admitted at the guilt or innocence stage and the punishment stage, *including evidence of the defendant's background or character* or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

* * * *

SPECIAL ISSUE NUMBER 3:

Taking into consideration *all of the evidence*, including the circumstances of the offense, the *Defendant's character and background*, and the personal moral culpability of the Defendant, do you find from the evidence that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

* * * *

The jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

51

3 CR 691–92 (emphasis added).

The Court first notes that, because the foregoing instructions required the jury to consider "all" evidence, including Rockwell's "character and background," his argument that the jury was unable to consider the fact that he was a talented athlete, a dedicated and hard worker, and a good child is not well taken.  Furthermore, his assertion that the definition of "mitigating evidence" somehow nullifies the jury's consideration of his character and background has been rejected in this Circuit.  *Blue v. Thaler*, 665 F.3d 647, 665–66 (5th Cir. 2011) (rejecting argument that Texas's definition of mitigating evidence effectively nullifies the word "background" in the special issue); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001) (recognizing that virtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's moral culpability); *see also Penry v. Johnson*, 532 U.S. 782, 803 (2001) (noting that Texas's mitigation special issue is a "clearly drafted catchall instruction on mitigating evidence" and a model of "brevity and clarity").  Rockwell fails to show that the CCA's ruling is contrary to, or an unreasonable application of, clearly established federal law.  The Court **DENIES** Claim 7.

### E.      Claim 8 (Prosecutorial Discretion)

In his final claim, Rockwell asserts that the practical effect of prosecutorial discretion in deciding whether to seek a death sentence has resulted in four Texas counties being responsible for 60% of the death sentences handed down in Texas.  Pet. at 79.  From this statistic, he concludes that the decision to pursue a death sentence is based on the prosecutor's ideological beliefs, experience, and the available resources of time and money, such that the decision is not "evenhanded, rational and consistent," and thereby violates the Sixth, Eighth and Fourteenth Amendments.  Pet. at 79.

Relying on law review articles, he also contends that the race of the victim is an unconstitutional motivating factor behind the decision to charge a defendant with a capital crime. Pet. at 80. The state habeas court ruled that Rockwell's claim failed both on the facts and on the law. 4 SHCR 1751–52.

The Supreme Court has rejected the notion that the Eighth Amendment limits prosecutorial discretion regarding whether to seek the death penalty. *McCleskey v. Kemp*, 481 U.S. 279, 306–07 (1987). Further, "no Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions." *See Allen v. Stephens*, 805 F.3d 617, 629 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 2382 (2016). And, although Rockwell provides statistics and law review articles and suggests hypothetical factors that may affect a district attorney's decision to seek the death penalty, he fails to offer any evidence or support from the record before the state habeas court to show that he was selected for prosecution based on an unjustifiable standard such as race, religion, or other arbitrary classification. *See Wayte v. United States*, 470 U.S. 598, 608 (1985) (holding that it is appropriate to judge selective prosecution claims according to ordinary equal protection standards).

In short, Rockwell fails to establish that the state habeas court unreasonably applied Supreme Court precedent or unreasonably determined the facts in rejecting his claim. The Court **DENIES** Claim 8.

## IV.   REQUEST FOR A HEARING

Rockwell requests that this court grant an evidentiary hearing pursuant to § 2254. This Court has discretion to grant an evidentiary hearing if one is not barred under § 2254(e)(2). *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). In exercising that discretion, the Court considers whether a

hearing could enable Rockwell to prove the petition's factual allegations which, if true, would entitle him to relief. *Id.* at 474. The Court also must consider the deferential standards in § 2254(d), which limit the Court's ability to grant habeas relief. *Id.* In practical effect, if the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing. *Id.*; *Pinholster*, 563 U.S. at 182–83.

Each of Rockwell's claims were adjudicated on the merits in state court, and the state habeas court's ruling was determined to be reasonable. Habeas relief is therefore precluded by § 2254(d), rendering a hearing on these claims inappropriate. *See Pinholster*, 563 U.S. at 183–84.

## V.   CONCLUSION

Based on the foregoing, the Court **DENIES** Rockwell's Petition for a Writ of Habeas Corpus. In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), and after considering the record in this case, the Court denies Rockwell a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right. *See Miller-El*, 537 U.S. at 338; *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000); 28 U.S.C. § 2253(c)(2). If Rockwell files a notice of appeal, he may proceed in forma pauperis on appeal. 18 U.S.C. § 3006A(7). All relief not expressly granted is denied, and this case is **DISMISSED with prejudice**.

**SO ORDERED** on this **18th day** of **August, 2016**.


_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**